Callihan v. Johnson.

is stated that he is temporarily absent, and that, had he known of his absence, he would have endeavored to have procured his deposition.

---

## James H. Callihan's Ex'r and another v. Collin Johnson.

The laws of this State, interfere as little as possible with the delicate and responsible relation of master and slave. Much is left to the master's judgment, discretion and humanity; but, in no case, except when the slave is in a state of insurrection, can any man take his life, without subjecting himself to the same punishment as would be inflicted if he had taken the life of a white person under similar circumstances.

Although this case must be determined by the laws in force, before the Penal Code was adopted as the law of this State, yet the Code may be consulted as containing, in its provisions on this subject, a clear statement of what the law was before it was adopted.

Before the adoption of the Code, there was no law defining the term, "insurrection," as applied to slaves; it was not used as synonymous with *insubordination*, but was used in reference to an assembly of slaves, intending to obtain their liberty by force ; and in the Code, it is defined as an assembly of five or more slaves, with arms, with *intent to obtain their liberty by force.*

In cases of insurrection, the right of those who compose communities, to protect themselves, and to preserve those relations which lie at the foundation of society, is analogous to the right of self-defence, a right which cannot be controlled by human laws, because it results from necessity, which is supreme.

Callihan v. Johnson.

The Code recognizes the right of the master to the obedience and submission of his slave, in all lawful things, and his power to inflict such punishment upon him—*not affecting life or limb*, and not coming within the definition of cruel treatment or abuse—as he may consider necessary to enforce submission to his commands; but the killing of a slave, under any other circumstances than those enumerated in Art. 564, is the same offence as the killing of a free person; and it is expressly provided, in Art. 566, that "flight, on the "part of a slave, except when in a state of insurrection, does not justify homi- "cide, either by the master, or any other person."

The law treats a slave as a human being, though in a servile condition. It recognizes his right to life, until an overwhelming necessity shall deprive him of it. It holds, that he is not capable of self-government, and that his true condition, in this State, is one of subjection and bondage; but at the same time, it accords to him certain rights, of which he cannot be deprived, but in conformity with the law of the land.

A master commanded a negro to deliver to him a pistol, which the negro had in his possession, and the negro refused to do so, drew the pistol and held it in his hand; but upon the master procuring a gun, the negro retreated, when the master discharged the gun without effect; then fired a six shooter once, also without effect; and when the negro was seventy or eighty yards off, fired his pistol the second time, and killed him: *Held*, that, although these facts showed a case of most flagrant insubordination on the part of the negro, yet they did not show a case of forcible resistance, on his part, within the meaning of the law, or that a necessity existed, such as it recognized, for taking his life; and that killing the negro, under these circumstances, was an unlawful act.

If a person who has hired a negro, kill him under such circumstances as do not authorize him to take the negro's life, he will be responsible, upon his contract to deliver the negro to the owner at the end of the hiring, for the full value of the negro.

So, if the negro come to his death by the wrongful act of the hirer, the owner is entitled to recover hire for the negro for the whole term of hiring.

APPEAL from Guadalupe. Tried below before the Hon. A. W. Terrell.

In a suit by the appellee, against James H. Callihan and George B. Hollamon, for the value of a negro man, and his hire for the year 1855, it was alleged, in the amended petition, that the said negro came to his death by the wrongful act of the defendant, Callihan, upon the 13th of April, 1855. After the commencement of the suit, Callihan died, and his executor, E. Pettus, was made a party. The appellants answered, that the

negro came to his death on said 13th of April, 1855, by a gun shot wound inflicted by persons unknown to the defendants, and without the knowledge, privity, or consent of said Callihan, and from no negligence or fault of theirs, or of said Callihan, &c. The appellant, Hollamon, also answered, that he was only the security of said Callihan for the hire of the negro, and as was well known to the plaintiff, had no interest in the labor or services, or control of said negro ; and if he came to his death by the wrongful act of said Callihan, he was not responsible. There was a verdict and judgment for the plaintiff, for the value of the negro, and the hire for the entire term.

The facts are sufficiently stated in the opinion.

*J. J. Thornton*, for appellants. The question raised in the record is, whether, under the circumstances of the case, Callihan is civilly liable for the value of the negro, or for his hire after the killing. If it be the law, that the master of a slave, is, under any circumstances, justified in taking the life of a slave, when he is not himself in immediate danger from the slave, and where the act is not done in the immediate and necessary defence of his own life ; then we think this case surely affords that justification, and in the case of Hedgepath v. Robertson, 18 Tex. Rep. 858, we understand the court to intimate that such is the law.

The case of Bradley v. Flewitts, 6 Rich. Rep. 69, was an action of trespass for killing a slave; and under the plea of not guilty, proof was made that the slave was a runaway, and that the defendants killed him while in pursuit, at the owner's request, and while the slave was fleeing from them. There was a verdict for the defendants, and the court refused to grant a new trial, on the ground that the evidence had been improperly admitted under the plea of general issue; and the court said that the evidence had been admitted at the trial without objection, and had been passed upon by the jury, as fairly as if the matters had been specially pleaded ; and that the only effect of a reversal of the case would be, to send it back, to have the

Callihan v. Johnson.

very same facts tried under another form of plea. It is not pretended or intimated, in that case, that the facts were not a complete justification. That appears to have been taken for granted. (See Smith v. Hancock, 4 Bibb's Rep. 222.)

The case of Allen v. Young, 9 Mart. Rep. 221, was one in which the plaintiffs sought to recover the value of a slave, killed by the defendant. The only question was, whether the killing took place under justifiable circumstances. The testimony was, "that the slave was in the habit of going at large, without a "written permission from his master; that he was of a bad "character, and was killed in an attempt by the defendants to "arrest him, on a suspicion of having committed a felony, while "he was endeavoring to effect his escape, having attempted to "seize a gun." There was a verdict for the defendants, and the court said, "the verdict of the jury is general, and decides both the law and facts of the case." (See Witsell v. Earnest, 1 Nott & McCord's Rep. 182; Jennings v. Fundeburg, 4 McCord's Rep. 161.)

It is contrary to the laws of this State for a negro to carry arms, &c. (Hart. Dig. Art. 2562.) We have no standing armed police, and when a slave is armed, and in open rebellion against the authority of his master, and making threats to use those arms against his master, as was done in this case, we think the public safety, and in fact the law of necessity, demands that the slave be subdued and disarmed, at every hazard; and if to do so, it be necessary to kill the slave, the person so killing him will be neither civilly nor criminally liable, although he at the time was in no immediate danger of life or bodily harm; and if so, then the instructions of the court were clearly wrong, and the judgment must be reversed.

*Jno. Ireland*, for appellee. The case of Smith v. Hancock, 4 Bibb's Rep. 222, cited by the appellants, shows that the negro was killed by the defendant, in self-defence, and that the negro was guilty of a felony, and might have been killed by any one in

arresting him. The case cited from 9 Mart. Rep. is so short, that nothing can be derived from it.

The case from 6 Rich. Rep. shows that the plaintiff, in that case, had directed the defendant to arrest the negro, *and to shoot him.* I have no access to the case cited from Nott & McCord's Rep., but I apprehend that some justification will be found, in all the cases cited by appellant. If the boy, in this case, was carrying a pistol, in violation of law, Col. Duggan's evidence showed that Callihan knew it, in March previous to the killing; and the fact is, Callihan had instructed the boy to carry the pistol while in the woods, as he had been doing the morning he was killed. (Bibb v. Hebert, 3 La. Ann. Rep. 132; Hendricks v. Phillips, Id. 618; Brady v. Price, 19 Tex. Rep. 285.)

BELL, J. The constitution of this State, (Art. 8, sect. 3,) provides that "any person who shall maliciously dismember or "deprive a slave of life, shall suffer such punishment as would "be inflicted, in case the like offence had been committed upon "a free white person, and on the like proof, except in case of "the insurrection of such slave."

The laws of this State interfere as little as possible with the delicate and responsible relation of master and slave. Much is left to the master's judgment, discretion, and humanity. But the law asserts its supremacy over both slave and master; and the constitutional provision above quoted, shows that it is the recognized policy of the laws of this State, to give to the lives and persons of slaves the utmost protection that may be consistent with the proper restraint to which slaves must, of necessity, be subject. The master has an absolute property in the faculties and services of the slave. The intelligence and the strength of the slave belong to the master, and may be put by him to any use, not contrary to law. But a slave has the same right to his life, that a free white man has; and the same right to appeal to the laws of the country for its protection. The constitution gives to every citizen the right to take the life of a

Callihan v. Johnson.

slave, when the slave is in a state of insurrection; but in no other case can a man take a slave's life, without subjecting himself to the same punishment as would be inflicted, in case the life of a free white person had been taken, under the same circumstances.

The constitution of the Republic of Texas, did not contain any provision similar to the one above quoted from our present State constitution. But the Act of the 5th of February, 1840, "concerning slaves," provided, "that if any person or persons "shall murder any slave, or so cruelly treat the same as to cause "death, the same shall be felony, and punished as in other cases "of murder."

The Act of the 11th of February, 1854, entitled "An Act "supplemental to 'An Act concerning crimes and punishments,' "approved March twentieth, A. D. eighteen hundred and forty-"eight," provided, that "murder or manslaughter committed "upon the body of a slave, shall be punished in the same "manner as murder or manslaughter committed upon the "body of a free white person." This is the only provision of law, enacted in relation to this subject, between the time of the adoption of the constitution of the State, and the time of the adoption of the Penal Code, which took effect on the first day of February, 1857. We think it very clear, however that before the adoption of the Penal Code, by the written law of this State, it was as much an offence to take the life of a slave, as it was to take the life of a free white person, under the same circumstances, except in the single case of the insurrection of the slave; and it is only with written laws, that courts of justice have anything to do.

The case before us must be determined by the laws in force in the year 1855, before the Penal Code was adopted as the law of the State; but we think that the Code may profitably be consulted, as containing, in its provisions on this subject, a clear statement of what the law was under the constitution, before the Code was adopted. There was no law before the adoption of the Code, defining the term "insurrection," as ap-

plied to slaves. That term, as used in the provision of the constitution before referred to, could not have been used as synonymous with *insubordination*. It was used in the constitution, in reference to an assembly of slaves intending to obtain their liberty by force.

The Penal Code, Title 19, Art. 651, says, "By insurrec-"tion of slaves, is meant an assembly of five or more, with "arms, with intent to obtain their liberty by force." In a case of insurrection, the right of those who compose communities, to protect themselves, and to preserve those relations which lie at the foundation of society, is analogous to the right of self-defence, a right which cannot be controlled by human laws, because it results from a necessity which is supreme. But the right to take the life of a slave, except in those cases where there is an actual and overwhelming necessity, is not, and ought not to be, recognized by law.

Article 564 of the Penal Code, in its subdivisions, enumerates the cases in which homicide, committed upon a slave, is justifiable. "1st. When a slave is in a state of insurrection. "2d. When a slave forcibly resists any lawful order of his "master, overseer, or other person, having legal charge of him, "in such manner as to give reasonable fear of loss of life, or "great bodily harm, in enforcing obedience to such order. "3d. When a runaway slave forcibly resists a person attempt-"ing to arrest him, in such manner as to cause reasonable fear "of loss of life, or great bodily harm, in making such arrest. "4th. When a slave forcibly resists any patrol or officer of the "law, in such manner as to cause reasonable fear of loss of "life, or great bodily harm, in executing such order. 5th. When "a slave uses weapons, calculated to produce death, in any "case other than those in which he may lawfully resist with "arms, under the provisions of part the 3d of this Code." Article 802 of the Code, says, "the master has not the right "to kill his slave, or to maim or dismember him, except in cases "mentioned in Article 564 of this Code;" which are the cases before enumerated.

The Code also recognizes that "the right of the master, to "the obedience and submission of his slave, in all lawful things, "is perfect;" and that "the power belongs to the master to "inflict any punishment upon the slave, *not affecting life or* "*limb,* and not coming within the definition of cruel treatment, "or unreasonable abuse, which he may consider necessary for "the purpose of keeping him in such submission, and enforcing "such submission to his commands."

The Code also expressly provides, in Art. 566, that "flight, "on the part of a slave, except when in a state of insurrection, "does not justify homicide, by either the master or any other "person;" and it says further, that "the killing of a slave, "under any other circumstances, except those enumerated in "Art. 564, is the same offence as the killing of a free person."

Such is the law as it is now in force; and such, in its general spirit and effect, we believe it to have been, under the constitution, before the adoption of the Code. It treats the slave as a human being, though in a servile condition. It recognizes his right to live, until an overwhelming necessity shall deprive him of life. It holds, that he is not capable of self government, and that his true condition, in this State, is one of subjection and bondage. But at the same time, it accords to him certain rights, of which he cannot be deprived, but in conformity with the law of the land. Applying these principles to the case before us, we conclude that the killing of the slave Humphrey, by Callihan, was an unlawful act. The testimony shows that the killing took place in the month of April; and one of the witnesses testified that, in the month of March preceding, Callihan was aware that the negro was in possession of a pistol. It seems, from the evidence, that Callihan had determined to take the pistol away from the negro. He ordered the negro to deliver the pistol to him, and the negro refused to do so. According to the testimony of one of the witnesses, the negro, instead of delivering up the pistol, when he was ordered to do so, drew it from his pocket and held it in his hand. If he had been shot at that moment, the case would have presented a dif-

ferent aspect. Callihan's son brought a shot gun, which he had been sent to the house to procure. The negro then retreated. These facts show a case of the most flagrant insubordination, on the part of the negro, but they do not show a case of forcible resistance on his part, within the meaning of the law; nor do they show that a necessity existed, such as the law recognizes, for taking the negro's life. It seems that the discharge of the shot-gun was without effect, and that Callihan fired his six shooter once without effect, and that the negro was sixty, or seventy or eighty yards distant, when the shot was fired that took effect on him. We are of opinion, that the killing of the negro, under these circumstances, was a wrongful act. Callihan and Hollamon, by their contract, bound themselves to return the negro to the owner by the 25th day of December, 1855. The judge properly charged the jury, that the failure to return the slave, rendered Callihan and Hollamon liable on their contract for his value, unless the jury should be satisfied, from the evidence, that Callihan killed the negro in self-defence, or that the death of the slave was caused by inevitable accident, without any default or wrongful act of the hirer.

The judge also instructed the jury, that if the negro came to his death by the wrongful act of Callihan, then the owner was entitled to recover hire for the negro, for the whole term of the hiring; but if the negro came to his death by inevitable accident, or without any default, or wrongful act of the hirer, then the owner could only recover so much of the hire as was due at the time of the slave's death. There was no error in this charge. The very point was decided by this court in the case of Robinson v. Varnell, 16 Tex. Rep. 382. In that case, the court said, "the right of the plaintiff to recover the hire, in "this case, rests upon the same ground as his right to recover "the value of the negro; that is, that the loss to the plaintiff "was occasioned by the wrongful acts of the defendant, for "which he is legally responsible." And the court went on to say, "there was no error in holding that the plaintiff was enti-"tled to recover, both the value of the negro and the hiring,

"since he was deprived of both by the wrongful acts of the "defendant, and without fault on his part." We are of opinion that the judge did not err in his instructions to the jury, and that the verdict was in accordance with the evidence. The judgment of the court below is therefore affirmed.

Judgment affirmed.